Good morning, Your Honors. I would like to reserve five minutes for rebuttal if I may. May I proceed? Yes. Your Honors, the immigration judge made three critical errors in denying petitioner's request for asylum and withholding of removal. An adverse credibility determination, an alternate finding of no future persecution. None of these findings is supported by substantial evidence and therefore this Court must reverse. I would like to address each in turn. With respect to the adverse credibility determination, the immigration judge first began by focusing on Florentino Hernandez-Ortiz's misrepresentations with respect to leaving the United States and being detained by the Border Patrol. And for sake of avoiding confusion, I will refer to the petitioners by their first names throughout the argument. The finding with respect to Florentino's lie to the immigration judge, the lie to the immigration judge is not condonable. It is not excusable. But that is not the test that this Court applies to determining whether or not an adverse credibility determination is supported by substantial evidence. The immigration judge I wonder if I could direct your attention to an issue that has concerned me. What personal harm have the petitioners suffered in this case? I mean, it's clear the family suffered some. It's clear that they couldn't go out and play when they were 7 and 8 and there was a general concern. But not their family, but they personally, what personal harm does the record reflect that they suffered? Your Honors, I would say that there were two harms. The first and the most significant was the lack of food. The record, it is undisputed in the record that petitioners went without food. At no point do they say they were completely without food. But it was clear that they lacked sustenance. The food was getting less and less. All they had was food from prior years' harvest. By the time that they fled, according to their declarations put into evidence, they were beginning to go hungry. What had happened was when the... And how old were they when this occurred? Florentino was 7 years old and Guillermo was approximately 9 years old. Okay. So this is when they were young. How do we attribute that to the government or to the guerrillas or to the government's failure to control the guerrillas? We understand this is a very contentious time in Guatemala's history, but the lack of food seems to be several steps down the cause chain here. So what are we supposed to do with that? The lack of food was caused when the government troops invaded the village of Gracias Adios. They prevented the villagers from tending to their crops. It was the government that was depriving the entire village of food. As the evidence states in the record, it was villagers, because they were of Mayan descent, were at least suspect of having guerrilla sympathies, and therefore they prevented the villagers from tending to their crops. And this began upon the army's entry into the village. Does that mean, counsel, that... Let's say hypothetically there were 100 people in that village. Does that mean every one of those people in the village would be eligible for what your clients are seeking? By virtue of the fact that the government troops, horrendous though it may have been, made it impossible for these folks to farm. Is that what it takes to meet the burden that the petitioner has to meet here? Two things, Your Honor. First, with respect to the fact that there were multiple other villagers subject to the same persecution, I do believe that that can form a basis of finding of past persecution. In the Garcia Hernandez case, a whole village was subject to persecution, and the court found that that bolstered a claim that everyone in that village had an imputed sympathy to the guerrillas, and that the military was, in fact, targeting the entire village, and therefore it's likely that all of the villagers were suffering, and therefore that was persecution. In this case, and the second point I wanted to make, was that petitioners have more than just the fact that they were deprived of food, as were the other villagers. The testimony is that their brother was beaten and forced to flee, and that their father was. And I think, although... Again, and I appreciate the fact that for them it's a very serious issue, but these were young boys at the time. Under the law, your clients have to allege a personal, personal suffering or injury. And the fact that the father and the brother had these incidents, are you arguing that that is what, that is their personal claim? No, Your Honor, as I am not. I am arguing that that bolsters their claim. It makes them unique with respect to the personal suffering they incurred was the fact that they were deprived of food, and that, I think, although the government talks about the fact that it was the petitioners who kept them in their house, the fact that they were essentially hidden for three to four months while the military was occupying, and they were hidden because the parents had a legitimate fear that the petitioners may be conscripted into the civil patrol. And so these were... At seven and eight? Nine? Seven and nine. That was the reason that the parents kept them. How old was Umberto at this time? Based on Guillermo's testimony, he was in his early 20s. Older than 20 is what was presented to me. Okay. I mean, he's ten to 15 years older than at the time that he's conscripted. So they don't really have a fear that Guillermo and Florentino are going to be conscripted at the age of nine and seven. No, Your Honors, there was. Guillermo testified that at least boys as young as 13 were being conscripted into the civil patrol units, and that the parents feared that other young boys, and this was the reason they were hidden, would also be conscripted. I don't know if certainly it doesn't appear that there was some kind of criteria that the military was using to conscript these young men. But realistically, counsel, I mean, these are heart-rending stories, and I want you to know that I'm very empathetic about this. But the fact is there's a burden to be proven here. The issue of the food, sadly, about hundreds of millions of people on this earth, if that were the allegation necessary to be made, could become, you know, residents of the United States, because sadly they are suffering similar deprivation. There's a big difference between seven- and nine-year-old boys and 13-year-old boys. 13-year-old boys, as you know, they're young, they're masculine, they've begun to fill out, and unfortunately in Africa and Asia and other parts of the world, many times they are conscripted. But seven- and nine-year-old, I have real difficulty with that. Can you help me? Are these unusually big kids? Are they, did they fill out early? Why would there be a realistic concern that they would be conscripted? Your Honors, I don't know what their stature was, what their physique was at the time they were seven and nine. It certainly isn't in the record, and I would have no evidence to put forth as to why these particular individuals, why the parents feared that they would, other than we have to credit the fact that the parents were there, and the parents, as any parent, is going to be protective of their child, but is going to look at what are the realistic dangers to their child. No one can fault the parent. Each parent does what each parent intends to do. I've got six children, so I can empathize with that. But the fact is, your client has to bear a burden. You've talked about the food. We, again, we've got a problem here in terms of bearing the burden. In terms of the conscription, I understand the parents made that decision. Whether it was a realistic concern and whether it personally affected these boys is another matter. You and your clients have the burden to show how they personally were involved. If you're talking about the brother or the uncle, that's another matter, because then there's testimony directly of what happened to them, but not with the boys, unless there's something in the record I'm not aware of. No, I mean, no, Your Honors. I think what I would like to make clear and articulate is that ultimately the test is one of cumulative effect. And so I do believe, Your Honors, the case law, and I would cite to the Badala case as well as the Sarita case that we recited in our briefs, with respect to the type of non-physical injury that may be, may give rise to a past persecution claim. In the Sarita case, it was repeated robberies and then a deprivation of the ability to earn a living. In Badala, it was the same type of inability to have a livelihood because of some government activity. What evidence, counsel, is there that the brothers will be persecuted if they are returned to Guatemala? It's a multilayered analysis, Your Honors. The first, and these findings are consistent with what the immigration judge found in her decision, is that they are Mayan refugees. And she also made a determination in her decision that she had no doubt that there was at least a great amount of discrimination, and she even said general persecution towards Mayan refugees. This goes to Judge Smith's question as to whether all Mayan Guatemalans will now be eligible. If we were to find in favor of your client, whether that would mean, then, that all Mayan Guatemalans from this region of Guatemala would then be eligible for asylum in the United States. I think that's a very significant question, and I'd like to know what your response is. I'm definitely going to ask this question of the government. And that is not the end of the analysis, Your Honor. I think that's the beginning point, the recognition that these individuals, and there is substantial evidence supporting these individuals' claims, that as returning Mayan refugees, they will be subject to persecution. But these individuals have more. They do have an individualized fear. And what's the individualized fear? The first, Your Honor, and this goes to the fact that their brother and father were beaten and brother later killed by the military, and so that will Now, the record on whether Humberto was killed by the military, I think, is not clear. The government made the argument below that it was unclear why the government, that Humberto was killed along with two Mexican nationals along the border by the Guatemalan government, and the question was, why was he killed? Was it because of guerrilla sympathies, and the government was suggesting that there wasn't at least evidence to support that he was in petitioners would allege is that it was killed because he was a Mayan, and he was, there was an imputed sympathy regardless of whether or not he was actually supporting or even against the guerrillas. But, Your Honor, the point is that in the mind of those who are continuing in power, particularly in the rural areas, those with former ties to the military and civil patrol, the fact that the father was beaten and fled, and Humberto beaten, fled, and later killed, is going to signal to them that this family has guerrilla sympathies. If they were in league, why else flee? Why was Humberto, I mean, that's the point. In the military's mind, there is at least a possibility. Again, if that's right, that means that everybody that went into the refugee camp in Mexico would now be eligible for asylum in the United States, and is that your argument? That's a straightforward argument. If you want to make it, make it. I do think that if all we had in the record was the fact that these were Guatemalan refugees attempting to return home, I do think they're consistent with this Court's prior holdings that that would be sufficient to allege a claim of, or to support a well-founded fear of future persecution. And I do want to make that clear, Your Honors. But I don't think the Court has to stop there, and I don't think this Court has to fear that somehow the precedent set will open the doors to asylum claims by anyone who is living in a refugee camp in Mexico as a result of the Guatemalan Civil War. I think the fact that in this instance there is undisputed evidence that the father was beaten and that the brother was beaten, this makes it an individualized fear. And in addition to that, Your Honors, in this case we don't have any threats. We have no evidence of any particular threats against Guillermo or Florentino. Do we have any evidence of threats against anybody that was a relative of Humberto, that if they return to Guatemala that they will be harmed? As far as the record states, Your Honor, the immediate family of, there were only three brothers, Humberto, Florentino, and Guillermo, and the two parents. In that immediate family there are some cousins, but the record was unclear as to the, the cousins had fled as well, but it was unclear the whereabouts of the cousins presently. The, I think in addition to the fact that the brothers were, I think that, you know, the fact that family members are persecuted can bolster a claim. And in addition to that, we have the fact that the brothers in this instance have no ties to Guatemala. They don't have land. They don't have family. They don't have any means of support. So unlike perhaps other returning refugees, they are going to have to enter a world where they will stick out. They cannot just blend back into society. They're going to have to either demand some land either back in their village where they left from some other region in Guatemala. They're going to have to seek some type of government assistance. But counsel, again, with due respect, these are economic issues you're talking about, difficult, but economic. What I'm troubled about here is you talk about the cumulative effect, but it's another type of penumbra having nothing to do with the, any other parts of the Constitution. But there's got to be a core before you can have a penumbra or emanations from the penumbra. And I am still troubled by the fact that there is, I'm not finding anything in the record, I'm not finding anything in what you're saying that is tied directly to these two young men. Yes, there's economic difficulty. There's economic difficulty all over Guatemala and in many other parts of the world. And unfortunately, our law, fortunately or unfortunately, however you look at it, our law does not provide that that is a ground for asylum. We need to see some particularized harm or threat of harm to these two young men. And the fact that they are part of a Mayan family, the fact that when they were seven and nine years old, their parents kept them in for fear of the military, I don't see any case law, I don't see anything in the statute or the regulations that would allow us to give them relief on that basis. Am I wrong? I would argue that, Your Honor, there is basis in both case law, in case law that would find both past persecution based on the deprivation of food. To the individual. To the individual, Your Honor. And again, the Cerita case and the Bedalla case are the types of cases where it's economic harm, the type of deprivation can create past persecution. And then the fact that there were attacks on the family, I think, bolsters that past persecution. The Rios case and the Bedalla case, again, demonstrate that type of bolstering effect. When we get to the case of the well-founded fear of future persecution, I view it essentially as a wall, they're slowly building up a case, and each layer becomes more individualized. You have Mayan refugees, then you have the fact that their parents were beaten, or father and brother were beaten, then more individualized, the fact that these individuals have no ties to Guatemala. It's not a case of everyone's entitled. These individuals have a well-founded fear of persecution. Counselor, your time is going to run down. I want to make sure that you have time to stay. I do want to ask you about one matter, because as we pressed you on this, you started off to talk about credibility. And the one thing that you haven't said here that I expected you to say, which would have gone back to the credibility, was that they fear Comandante Hernandez. And that seems to go to the heart of what the I.J. was concerned about here with Florentino's misrepresentation. So do you want to take this briefly and tell us why we really should credit their testimony, that Comandante Hernandez, because I'll tell you what my concern is. It seems to me that the Comandante Hernandez information comes sort of contemporaneous with their phone calls to their parents. And in light of Florentino's testimony, there is reason to doubt here that their parents still are in the place where the boys believe that they are and where they claim that they got their information about the Comandante. And I will address that, Your Honor. And the reason I didn't address Comandante Hernandez is because regardless of how this Court rules on the adverse credibility issue, I think the other evidence that the judge did credit would still support reversal in this case. But certainly if the adverse credibility determination is reversed and that adds an additional individualized fear, and that is that Comandante Hernandez, at least in the region of Gracias a Dios, is present. The reason that the immigration judge's findings with respect to that are not supported by substantial evidence is the fact that, first, the inconsistency in date is completely explainable. In fact, the judge recognized they didn't have a good recall of dates. What she didn't go on to recognize was that this Court has repeatedly held that inconsistencies in dates are not a valid basis ordinarily to find adverse credibility. The Singh case that we cited, Your Honor, in our supplemental authorities, has an excellent explanation of why date inconsistencies are often common in these types of situations. Second, Your Honor, ultimately, and this kind of works with the well-founded fear, ultimately Comandante Hernandez was not at the heart of the claim. Certainly it bolsters her claim, and if it comes in, I think it more proves it even more substantially well-founded fear. But even without it, Your Honors, they feared the military throughout Guatemala, and so Comandante Hernandez was mentioned in their applications, I mean, in their declarations and in testimony. I'm not going to say he was a nonentity, but he was not the basis of their claims of past persecution and future persecution. Thank you. Mr. O'Connor. Good morning, Your Honors. May it please the Court. I am Blair O'Connor, representing the Attorney General in this matter. The record in this case fails to compel the conclusion that Petitioners credibly established their eligibility for asylum and withholding of removal. Now, the immigration judge made two findings. First, she found that she denied their claim because she found that their claim was not credible. And then she alternatively made a merits finding, assuming even they were credible, that failed to substantiate that they personally experienced past persecution in Guatemala or face an individualized risk of future persecution. I will address those findings in order, unless the Court would like me to first address the merits finding first. Yeah, I would like you to get to that, but I would – I just want to make sure what the government is and isn't arguing, because I saw different things in, as I looked at the transcript of the oral argument before the IJ. Is the government making any argument, any claim here that the brothers can be – were firmly resettled in Mexico? That argument was made in closing arguments before the IJ. I didn't see it in your brief. I just want to make sure. I'm ticking things off so that I can get things. I would not say that we've completely let go of that, Your Honor. Are you arguing changed country conditions? Well, that – we find that the IJ or the board never addressed. Okay. And so if this board were to find past persecution, it would need to remand so we can address that. Okay. All right. What about the claim that the brothers could be resettled elsewhere within Guatemala? We would say that the documentary evidence of record does suggest that when you're dealing with the Mayans in these rural villages, especially Mr. Reading's report, which Petitioners relied upon, that they could be resettled in Guatemala or the larger cities without a fear of future – without a threat of future persecution. So of those – of those three things, the firm resettlement, the changed country conditions, or being resettled elsewhere within the country, the government is still – still actively relying on the idea that they could be resettled elsewhere within Guatemala. Yes, Your Honor. Thank you. Mr. O'Connor, I appreciate your spelling out how you do it, and obviously credibility comes first. On the other hand, I would tend to think that those are peripheral matters. So I'd like to ask you about – the heart of the case to me is the harm the brothers suffered. And I know there's been emphasis on the food, but as I've thought about it, it seems to me the greatest harm they suffered was the loss of their home. Under the pressure of the military, they had to run to run. And is there any greater loss than losing your home? Well, your parents, but they didn't lose their parents. I mean, Your Honor, I mean, I would say a greater loss could be severe physical harm to yourself. Does it have to be physical if they've lost their home? I mean, no. This Court has acknowledged that harm does not have to be physical in order to constitute past persecution. Well, would you assess how the loss of your home would feel for you? Again, Your Honor, I would – No. Answer that question. If your home was taken away, would you feel you were injured? Probably, Your Honor. Probably. Certainly, isn't that the answer? If someone wiped out your home or told you how to run away from it? Why do you hesitate to answer that question? I hesitate to answer because, Your Honor, the brother's testimony was that the parents' decision to flee was because of the fear that the father and the older brother would be forced to join the civil patrols. But look at this, Mr. O'Connor. This is a family. These little boys have to go to the father. You can't isolate them and say they're just individuals who have to – Once the harm is expended on the family, they're brought up in it. Isn't that true? I understand, Your Honor. Did you ever think back to your own time when you were 9 years old? I understand, Your Honor. But I'm not aware of any court saying that. But you didn't answer my question. How would you feel about your home being taken? I would be upset, Your Honor. But I'm not aware of any court saying that the loss of home alone constitutes past persecution. I mean, thousands, millions upon millions of people in the world lose their homes. It does not mean they're eligible to asylum in this country. And I'll tell you an analogy that occurred to me. Would you comment on it? It's only an analogy. But have you ever seen the movie The Sound of Music? A long, long time ago, Your Honor. And you know the Van Trapp family has to flee Austria because of the threatening atmosphere and because their father is being conscripted into the German Navy. Now, do you imagine any immigration judge in this country saying, I'll return the Van Trapps to Germany because they personally did not suffer harm? They'd say, no, they had to flee. They lost their home. Isn't that right? Could you imagine the Van Trapps being sent back? Again, Your Honor, I — Well, you just don't let your mind go. What do you think? I would say that, again, I'm not aware of any court saying that loss of home by itself equates to someone being granted asylum in the United States. Well, it's not quite by itself, is it? Their village, which must be a small place, is, in the words of the immigration judge, raided by the military. These people are hostile. They're armed. And it turns out they're violent. They beat up the father of the boys. Yes, Your Honor. That's more than just sitting there. There's something physical that's happened to the family. Yes, Your Honor. But we need to look at personally what's happened to the two boys. And they were not — What's happened? We need to look at what happened to the two boys while they were — We do. We're looking at the family. Why should we look at the two boys? Because past persecution requires a personal — a personal harm to the — You think the army has beat up the boys and given them an occasion to come here. I find that fantastic that you so isolate the family. Two little boys have to be individually persecuted. No, you're going by the letter of the law, perhaps, but certainly not by the substance of the law. I understand, Your Honor. And I will recognize that harm to family members definitely is relevant. We're dealing with the threat of future persecution. It's beyond those foreign courts. It's harm to little boys, harm to their father. That's different. Do you know any case that says that's not persecution? I'm not aware of any case that said that harm to family members by itself — Please get away from family members. Harm to the father and the children at 9 and 7. Do you know any case that prestates that we should segregate the two little children? I can't name a case off the — No, you can't. Well, I wanted to be up front with my difficulty. And once you have that presumption of — once you have the past persecution, of course, there's a presumption of future persecution. I understand that, Your Honor. And, again, I appreciate your — the difficulties of this case with what happened to the parents. I mean, the government is completely appreciative of that. And what happened to the family was horrific. But, again, we would just emphasize that these two boys never even saw the soldiers when they entered the village by Guimero's own testimony. They're very honest in their testimony. But do you think they sat in their house and didn't say to mom or dad, what's going on? Well, Guimero testified that he was not told by his parents what had happened until a year after they had resettled in Mexico or in the refugee camp in Mexico. When the parents fled, did they say nothing to the boys while they were fleeing? Again, Guimero's testimony was that the father did not tell him why he fleed until a year after they had been in Mexico. Guimero did not testify as to what explanation was given as it occurred. Well, the testimony goes to whether they personally felt fear, but it does not go to whether they were deprived of their home and subjected to the threat of violent behavior. With respect to their credibility ruling, Your Honors, the demigration judge did offer a specific cogent reason, obviously for disbelieving Florentino's testimony, because Florentino deliberately lied in court under oath repeatedly about a prior departure from the United States in 1997. I'm a little puzzled as to what to do with that, because the IJ later on makes specific findings that they are Guatemalans and that they are Mayans. And if Florentino was lying about things, we might have thought that the IJ would say, gee, I don't even know if these guys are even Guatemalans. They may be Mayans from Chiapas State and may be Mexicans. But she specifically makes a finding that they are Guatemalan Mayans. And so I think that that sort of cuts against the credibility ruling. I mean, I think it makes it more likely that Florentino was telling the truth the second time. It's clear he was lying the first time, but that he was telling the truth the second time and that he was speaking truthfully as to what his motivation was. Yes, Your Honor. I think it's relevant because, you know, at one point the immigration judge told Florentino, well, the fact that you've lied to me, even after you were shown the admission document with your photo and fingerprint showing that you had tried to enter an apron and so on, you still continue to lie at that. If I can't believe you about that, then how do I know what else to believe you about? Yes, you did concede that based on the evidence of the birth certificates and stuff that they were Mayans from Guatemala. But she questioned what other aspects of his claim might he have been lying about. Might he have just basically said everything that Guimero told him to testify to? But she doesn't question Guillermo's testimony. She does question the extent that Guillermo testified both before her and to the psychologist, Dr. Ross, that he had contact with his parents. Well, that's the one – that's the only aspect of Guillermo's is sort of a timing on when they talk to their parents. Yes, and we say that's important, Your Honor, because, again, it was brought out during Opposing Counsel's opening argument. A very significant thing with respect to their fear of future persecution is the presence of Comandante Hernandez in their village back in Guatemala. The background documentary evidence shows, illustrates that most of the fears of future persecution stem from the civil patrols and not from the Guatemalan military in general. Therefore, Comandante Hernandez's presence in the village is critical to their claim of future persecution. And when questioned by the immigration judge as to how he learned that Comandante Hernandez was still in the village, he said, I learned it from my parents when I talked to them in 1998. He offered that date. It was not suggested to him by the immigration judge. Furthermore, both Guimero and Florentino told Dr. Ross that their parents were living in the refugee camp in Mexico as recently as January 1999, and it was only after that that they lost contact with them. Well, we know now from Florentino's rehabilitative testimony that that had to be, that could not have been correct, because as of April of 97, he went down there. They were no longer in the refugee camp. Therefore, they could not have been told in 1998 or 1999 by their parents that Comandante Hernandez was still in the village. And that is a critical component of their fear of future persecution, and it's why the immigration judge properly found that that claim was not credible. And, again, we do emphasize the statements that they gave to Dr. Ross. They were questioned, both brothers were questioned by the immigration judge as to why, can you explain why Dr. Ross would have indicated that your parents were still in the refugee camp in January of 99? Neither petitioner could offer a reasonable explanation for why Dr. Ross would have stated that. Is it clear that the information about Comandante Hernandez came in 1998 or 1999? Yes. Again, I mean, Guimero was questioned, when did you learn this information, and he offered up that date, 1998. I mean, if you ask me about phone calls that I made, and at this time it would have been, you know, three years earlier. So if you ask me about phone calls that I made in 2004, I might remember the fact of a particular phone call. But being able to pinpoint a month and maybe even a year would be very difficult. So is there any reason for us to want to cut, I mean, I think the IG, is there any reason for us to cut him a little flag and say, well, okay, it's clear that you had some phone calls with your folks and you heard about Comandante Hernandez. Is it clear that another point, your folks are no longer in this village, in this refugee camp in Chiapas, and we're not sure what the order is, but. Yes, Your Honor. Again, the immigration judge recognized that there is going to be difficulty in remembering dates like that. So she did recognize that. She gave them any benefit of the doubt. But we're not dealing with just a routine phone call. Is it clear that they heard about Comandante Hernandez from their parents as opposed to their other contact person in Chiapas State? The immigration judge asked him, where did you learn this information? And Guimero initially testified that he heard it from others in the camp. And then the immigration judge asked him who, and he said, I learned it when I talked to my family. So it was pretty clear that he learned that information from the parents in the refugee camp. And, again, we can see that routine phone calls, obviously, made two years ago would be difficult to remember. But this is a very critical phone call. This is a phone call that is one of the primary basis for why they fear going back to Guatemala and going back specifically to their village, because this leader of the civil patrol who engaged in the persecution of their brother and father is still in that village. That's a very significant phone call. And we would say being off by that by almost two years, you know, from 1998 to, you know, you tell the psychologists in January of 1999, we know from their brother that they weren't there as early as April of 97, that that is a pretty significant gap. And it does lend support to why the older brother as well, his claim was not credible. Again, in respect to the well-founded fear of future persecution, yes, the immigration judge did acknowledge, obviously from the documentary evidence, that Mayans, even after the 1996 peace accords, still faced a degree of discrimination and even possibly general persecution. But she probably found that there was not evidence that there was a pattern in practice of persecution against Mayans specifically. Most of the documentary evidence presented showed that most of the abuses against returnees to Guatemala were from those who were human rights activists, those who were investigating past abuses and were actively involved in bringing those to light. So what does the record show about the country report on this issue, if anything? Well, the State Department report indicated basically that those who feared persecution from the government, that there was not a particularized threat in the future following the 1996 peace accords. That was the State Department's conclusion. Even Mr. Reading, again, who they relied on, said that for most returnees, there was not an individualized threat from the government or the civil patrols upon their return. There were some notable exceptions, but the primary one mentioned by their expert in their affidavit concerned a different village in which a number of returnees were killed, but those who were responsible for it were being prosecuted. Investigations are underway for that. So, again, anything with respect to the area where these folks were from? Again, the opposing counsel in their reply brief did mention the Reading affidavit mentioned one instance of a town that was close in their department where there were some allegations of discrimination against the returnees who were coming back from Mexico, but I believe it was along the lines of that their medians were broken up and that their names were taken on a list. There was no allegations of specific physical harms against those returnees by the civil patrols in those villages. Therefore, again, we would say that the immigration judge properly found in the alternative that they failed to show an individualized risk of a fear of future persecution. Again, what happened to their family was obviously regrettable, but it was 20 years ago. They were never individually threatened by anyone in Guatemala. They showed no evidence of anyone in Guatemala being specifically interested against them in these ensuing 20 years, the time of their asylum hearing. Therefore, they properly found that there was no individualized threat of a fear of future persecution. How long have these young men been in the United States? They entered in 1991, Your Honor, so approximately 16 years. So they are now in their 20s? Yes, Your Honor. So barring any further questions from the Court, we would say we would ask this Court that the immigration judge did provide specific cogent reasons for adverse credibility determination that should be upheld. And in the alternative, the evidence of this record fails to compel the conclusion that these individuals personally suffered past persecution or had an individualized fear of future persecution. Thank you, Your Honors. Your Honors, I would just briefly note that with respect to adverse credibility, even if you find that the testimony with respect to Guillermo and Cominante Hernandez, that did not go to the past persecution claim at all, which is supported by the evidence presented by Guillermo, including the fact that the family was injured. And, again, the Rios case, I think, addresses that point. Because the government did not attempt to rebut that well-founded fear, I believe that a reamend with an order of granting of asylum is appropriate. Counsel, what do we do with the government's claim that they can be resettled safely elsewhere within Guatemala, as long as they're not returning? You know, if you knew that Cominante Hernandez is going to be a problem and that he's in Gracias a Dios, why don't they go to Guatemala City and can that be done? Is there any problem, any evidence in the record that would suggest that that would also be a problem? Yes, Your Honor. The reason being that, again, the general factors upon which we base our analysis, the returning Guatemalan Mayan refugees would apply throughout. The fact that they have no home, no ties to Guatemala throughout, is going to, again, raise their suspicion level. The fact that they were from a village that was targeted is going to raise their suspicion level. Counsel, this then, again, sounds like a generalized claim that all Mayan Guatemalans are entitled to asylum in the United States. No, Your Honor. I don't believe that's the case. Not all Guatemalan refugees are coming from this particular village that was targeted. But it would be – but your argument would extend to anybody that was, for example, from Gracias a Dios. Anyone who is from Gracias a Dios who is – Who had been resettled in Mexico. Who had been resettled in Mexico who are related to anyone who was beaten or fled. Well, I guess they would have fled if they were in a refugee camp. And who has no continuing ties to Guatemala, be it family, money, land. I think these are individualized characteristics, Your Honor. I don't think it's even all of the 70 to 100 plus members of the village. It is a more focused group than that, Your Honors. Thank you, Your Honors. We thank both counsel for the argument.
judges: Noonan, Bybee, M.smith